UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | Case Nos.  98-B-47996 (REG) |
| | : | 98-B-47997 (REG) |
| URBAN COMMUNICATORS PCS LIMITED | : | 98-B-10086 (REG) |
| PARTNERSHIP, *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |

------------------------------------------------------------- x

| | | |
|---|---|---|
| GABRIEL CAPITAL L.P., | : | |
| | : | 08-CIV-00946 (UA) |
| Appellant, | : | |
| - against - | : | |
| | : | |
| URBAN COMM-NORTH CAROLINA, INC., | : | |
| | : | |
| Appellee. | : | |

------------------------------------------------------------- x

**OPENING BRIEF IN SUPPORT OF GABRIEL CAPITAL L.P.'S APPEAL
FROM THE BANKRUPTCY COURT'S DECISION AND ORDER ON GABRIEL
<u>ENTITLEMENT TO POST-PETITION INTEREST ENTERED DECEMBER 11, 2007</u>**

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman (DF-4278)
Robert M. Novick (RN-4037)
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

Counsel to Gabriel Capital L.P.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.     INTRODUCTION ............................................................................................................1

II.    STATEMENT OF BASIS OF APPELLATE JURISDICTION .........................................3

III.   STATEMENT OF ISSUE PRESENTED ON APPEAL..................................................3

IV.    STANDARD OF APPELLATE REVIEW ........................................................................3

V.     STATEMENT OF THE CASE ........................................................................................4

       A.   The Chapter 11 Cases. ........................................................................................4

       B.   The Indebtedness to Gabriel. ...............................................................................4

       C.   The License Sales. ...............................................................................................5

       D.   Highlights of Procedural History...........................................................................6

VI.    ARGUMENT – The Bankruptcy Court Did Not Have Discretion to Reduce
       the Rate of Interest on Gabriel's Secured Claims to a Rate Below that Which
       Renders UC-NC Solvent ................................................................................................8

CONCLUSION .......................................................................................................................17

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re 139-141 Owners Corp.*, 306 B.R. 763 (Bankr. S.D.N.Y. 2004)............................................13

*Citibank, N.A. v. Nyland Ltd.*, 878 F.2d 620 (2d Cir. 1989)...........................................12

*In re Coney Island Amusement, Inc.*, 2006 WL 617979 (S.D.N.Y. March 13, 2006)..................15

*In re Consolidated Operating Partners, L.P.*, 91 B.R. 113 (Bankr. D. Colo. 1988)....................13

*In re Consolidated Props. Ltd. P'ship*, 152 B.R. 452 (Bankr. D. Md. 1993)................................10

*In re Courtland Estates Corp.*, 144 B.R. 5 (Bankr. D. Mass. 1992) .............................................13

*Cunningham v. Am. Automatic Sprinkler Inc. (In re Trinity Meadows Raceway, Inc.)*,
    252 B.R. 660 (Bankr. N.D. Tex. 2000) ..............................................................................10

*In re D.C. Sullivan & Co. Inc.*, 929 F.2d 1 (1st Cir. 1991) ..........................................................13

*In re DWS Invs.*, 121 B.R. 845 (Bankr. C.D. Cal. 1990).............................................................10

*In re Faraldi*, 286 B.R. 498 (E.D.N.Y. 2002) ...............................................................................3

*Fischer Enters. v. Geremia (In re Kalian)*, 178 B.R. 308 (Bankr. D.R.I. 1995)...........................10

*Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.)*, 338 B.R. 450
    (Bankr. D. Colo. 2005) .............................................................................................16, 17

*In re Hollstrom*, 133 B.R. 535 (Bankr. D. Colo. 1991).................................................................10

*In re Jonick Deli Corp.*, 263 B.R. 196 (S.D.N.Y. 2001) ...............................................................3

*In re Kelton*, 137 B.R. 18 (Bankr. W.D. Tex. 1992) ....................................................................13

*Key Bank Nat. Ass'n v. Milham (In re Milham)*, 141 F.3d 420 (2d Cir. 1998) ....................2, 9, 17

*In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998)...........13, 14

*In re Maywood Inc.*, 210 B.R. 91 (Bankr. N. D. Tex. 1997).......................................................11

*In re P.G. Realty Co.*, 220 B.R. 773 (Bankr. E.D.N.Y. 1998) .......................................................9

*Rake v. Wade*, 508 U.S. 464 (1993).............................................................................................8

*In re Reilly*, 245 B.R. 768 (B.A.P. 2d Cir. 2000) ..........................................................................3

**Page**

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960) . 11-13, 16, 17

*In re Terry Ltd. P'ship*, 27 F.3d 241 (7th Cir. 1994), *cert. denied sub nom Invex Holdings, N.V. v. Equitable Life Ins. Co.*, 115 S.Ct. 360, 130 L. Ed. 2d 313 (1994)..................9

*In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002).........................14

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 91 L. Ed. 162, 67 S. Ct. 237 (1946) ....................................................................................... 2, 11-13

*In re Vebeliunas*, 332 F.3d 85 (2d Cir. 2003)..........................................................................3

*In re Vest Assoc.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998)........................................................9

## Statutes

11 U.S.C. § 506(b)......................................................................................2, 3, 8, 11, 15, 16

11 U.S.C. § 506(c)....................................................................................................................7

28 U.S.C. § 158(a)(1) ..............................................................................................................3

## Rules

Fed. R. Bankr. P. 8013..............................................................................................................4

## Other Authorities

COLLIER ON BANKRUPTCY ¶ 506.04[2][b][i] (Lawrence P. King et al. eds., 15th ed. rev.) ...........9

Gabriel Capital L.P. ("**Gabriel**" or "**Appellant**"), by its undersigned counsel, respectfully submits this Opening Brief in Support of its Appeal from the *Decision and Order on Gabriel Entitlement to Post-Petition Interest* (the "**Bankruptcy Court Order**"), entered December 11, 2007 (Docket No. 496[1]) by the Honorable Robert E. Gerber in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the above-referenced chapter 11 bankruptcy cases.

## I.

## INTRODUCTION

In 1996, Gabriel made a one-year term loan to Urban Comm-North Carolina, Inc. ("**UC-NC**" or "**Appellee**") that was secured by all of UC-NC's assets (with the exception of its FCC Licenses, to the extent granting a security interest in them may not have been permitted by law). In 1997, Gabriel and UC-NC agreed to restructure and increase the amount of the indebtedness (the "**Loan**"), and extend its maturity date until September 30, 1998. UC-NC did not pay principal and interest when due upon the maturity date of the Loan. On October 28, 1998, UC-NC filed a chapter 11 petition and has utilized the chapter 11 process to liquidate its assets. It presently conducts no business other than holding the cash proceeds from sales of its FCC licenses.

The Bankruptcy Court has ruled that Gabriel is a secured creditor of UC-NC, and that Gabriel's loan agreements provide for it to receive interest at the rate of 19% compounded quarterly. However, UC-NC did not begin to make any payments to Gabriel until 2005, and it still had not repaid Gabriel in full. As a result, Gabriel's contractual right to 19% interest

---

[1] Items designated as the record on appeal by Appellant Gabriel are cited to herein by their Bankruptcy Court docket number.

compounding quarterly has resulted after over nine years, in indebtedness in an amount that would be the equivalent to having received simple interest at a rate of approximately 38%. The Bankruptcy Court then made an "equity determination" that Gabriel should only be awarded interest to the extent of providing Gabriel the equivalent of a simple rate of 25%. It is from that determination which Gabriel appeals.

A secured creditor is entitled to receive post-petition interest under 11 U.S.C. § 506(b) to the extent it is oversecured. Under the present state of the law in this Circuit (although not that of all jurisdictions), as articulated in *Key Bank Nat. Ass'n v. Milham (In re Milham)*, 141 F.3d 420 (2d Cir. 1998) ("**Milham**"), secured creditors generally receive interest at the rate provided by their contracts, but Bankruptcy Courts have "limited discretion" (*id.* at 423) to award less than the contractual rate on the basis of equitable considerations. Typically, as discussed below, the consideration informing the exercise of such discretion has been whether awarding a secured creditor interest at its contractual rate would be inappropriately prejudicial to unsecured creditors.

Gabriel ascribes error to the Bankruptcy Court's determination that it had discretion to select a rate of interest that reduces Gabriel's allowed claim *beyond* the extent necessary to render UC-NC solvent and able to repay all of its creditors in full, thereby creating a multi-million dollar windfall for UC-NC and its shareholders. Such a result appears to be unprecedented since the enactment of 11 U.S.C. § 506(b), and based upon a misreading of *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946) ("**Vanston**"). Gabriel respectfully requests that the Bankruptcy Court Order be reversed in part and remanded to the Bankruptcy Court to increase the amount of allowed interest on Gabriel's claims to the amount that renders UC-NC solvent.

## II.

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

This is an appeal from a final order of the United States Bankruptcy Court for the Southern District of New York. This Court has jurisdiction over this appeal (the "**Appeal**") pursuant to 28 U.S.C. § 158(a)(1).

## III.

## STATEMENT OF ISSUE PRESENTED ON APPEAL

Having ruled that Gabriel is an over-secured creditor of UC-NC and therefore entitled to post-petition interest pursuant to 11 U.S.C. § 506(b), whether the Bankruptcy Court erred by concluding that it had discretion to reduce the amount of interest provided by Gabriel's contract beyond the extent necessary to render UC-NC solvent and capable of paying all of its creditors in full in order to benefit UC-NC and its shareholders.

## IV.

## STANDARD OF APPELLATE REVIEW

A district court reviews a bankruptcy court's conclusions of law *de novo*. *In re Jonick Deli Corp.*, 263 B.R. 196, 198 (S.D.N.Y. 2001); *In re Faraldi*, 286 B.R. 498, 501-02 (E.D.N.Y. 2002). The same standard of review applies to a bankruptcy court's conclusions on mixed questions of fact and law. *In re Reilly*, 245 B.R. 768, 772-73 (B.A.P. 2d Cir. 2000) (holding "[w]hen mixed questions are raised on appeal, they are presumptively subject to *de novo* review" which "affords no deference to a trial court's determination" and allows the reviewing court "to decide the issue as if no decision had been previously rendered"); *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003) ("Mixed questions of fact and law are subject to *de novo* review").

Findings of fact made by a bankruptcy court may be set aside where clearly erroneous. *See* Fed. R. Bankr. P. 8013. Appellant submits that the issues raised on its appeal are issues of law.

## V.

## STATEMENT OF THE CASE[2]

### A.    The Chapter 11 Cases.

On October 28, 1998 and November 5, 1998 (the "**Petition Dates**"), UC-NC, Urban Comm-Mid-Atlantic, Inc. ("**UC-MA**") and Urban-Communicators PCS Limited Partnership ("**UC-LP**") (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). Bankruptcy Court Order at 4. UC-NC is a wholly owned subsidiary of UC-MA, which in turn is a wholly owned subsidiary of UC-LP. *Id.* The Debtors have not been substantively consolidated, and have been operated and treated as separate entities throughout the chapter 11 proceedings which have entered their 10th year.

### B.    The Indebtedness to Gabriel.

To make a required 10 percent down payment for the acquisition of certain radio wave spectrum licenses from the FCC (the "**Licenses**"), UC-NC and the other Debtors entered into a series of related agreements on or as of August 12, 1996, pursuant to which Gabriel loaned the principal amount of $8,000,000 to UC-NC. Bankruptcy Court Order at 5. UC-NC, as well as the other Debtors, granted Gabriel a security interest in all of their tangible and intangible property,

---

[2]  The material facts underlying the Appeal were not in dispute below and the Bankruptcy Court did not conduct an evidentiary hearing to reach the rulings set forth in the Bankruptcy Court Order. However, the Bankruptcy Court Order contains an incorrect assumption by the Bankruptcy Court that the Debtors were "bankrolled by the Debtors' equity" who thereby "bankrolled Gabriel's recovery." Bankruptcy Court Order at 38. *One* out of the Debtors' approximately 19 ultimate non-debtor equity holders loaned the Debtors about $1 million to fund a portion of the Debtors' professional expenses. He also covertly collected 15% interest on the loan, and was repaid in full in 2005, out of funds that constituted Gabriel's cash collateral. Docket No. 473.

the extent permitted by law. *Id.* at 6. Arguably, "the extent permitted by law" excluded the grant

of a direct security interest in the Licenses, but it did not exclude the grant of a security interest

in the proceeds of a sale of the Licenses. *Id.*

As the original Gabriel loan became due in August 1997, it became evident that UC-NC

would be unable to repay Gabriel's Note. Consequently, on or as of August 12, 1997, Gabriel

and the Debtors agreed on terms for a restructuring of the Debtors' obligations to Gabriel. The

restructuring agreements [Docket No. 292, Ex. I] provided, among other things, that (a) Gabriel

would purchase from UC-NC a 15% senior note due September 30, 1998 in the amount of

$1,000,000.00, thereby increasing the aggregate principal amount of UC-NC's debt to Gabriel to

$9 million; (b) the loan would bear interest in the amount of 15% per annum in the absence of

the occurrence of any event of default; and (c) upon the occurrence of an event of default, the

interest rate would increase to nineteen percent (19%) per annum, compounding quarterly.

Docket No. 292; Docket No. 358; Bankruptcy Court Order at 7, 12.

At the conclusion of a hearing before the Bankruptcy Court on April 7, 2005, the

Bankruptcy Court issued a bench ruling that Gabriel's claims are fully secured and, hence,

entitled to post-petition interest at a rate that was yet to be determined but not less than 15% per

annum simple interest. Bankruptcy Court Order at 4, n.4. The Bankruptcy Court reiterated and

buttressed that ruling in the Bankruptcy Court Order. *See, id.* at 12-22. UC-NC has appealed

separately from that ruling, as well as other aspects of the Bankruptcy Court Order. UC-NC's

appeal is presently pending as Case No. 08 Civ. 502 (RWS).

**C.    The License Sales.**

On July 13, 2005, UC-NC closed on an agreement to sell certain of its Licenses to Cellco

Partnership d/b/a Verizon Wireless ("**Verizon Transaction I**"). From the Verizon Transaction I

proceeds remaining after required payment to the FCC, $20,326,000 was eventually paid to

5

Gabriel. The remainder of the proceeds (the "**Retained Verizon I Proceeds**"), which constituted Gabriel's cash collateral, was retained by UC-NC and used to repay, in full and with interest, a loan from the Debtors' chairman. Docket No. 473.

By agreement dated March 1, 2006, UC-NC entered into an agreement to sell certain of its Licenses to Cricket Licensee (Reauction) Inc. (the "**Cricket Transaction**"). Upon closing of the Cricket Transaction, the Debtors received cash, net of payments required to be made to the FCC, in an amount that exceeded the Minimum Gabriel Claim, but was less than the total amount claimed by Gabriel. From the proceeds of the Cricket Transaction, Gabriel was paid an additional $1,831,913 toward the Minimum Gabriel Claim.

By order dated August 9, 2006, the Bankruptcy Court approved terms for a sale by UC-NC to Cellco Partnership d/b/a Verizon Wireless of certain Assigned Licenses and Disaggregated Licenses pursuant to the terms of an Agreement to Purchase FCC Licenses dated June 16, 2006 ("**Verizon Transaction II**"). Verizon Transaction II closed in early February 2007.

**D.    Highlights of Procedural History.**

On June 1, 1999, Gabriel timely filed a proof of claim against each of the Debtors (the "**Original Claims**") [Docket No. 292, Ex. K, L and M]. Gabriel filed amended proofs of claim against each Debtor on March 16, 2005 (the "**Amended Claims**") [Docket No. 292, Ex. N, O and P] in order to update Gabriel's computation of its rights to postpetition interest.

On March 17, 2005, Gabriel filed the *Motion of Gabriel Capital L.P. to Compel Payment of Cash Collateral Pursuant to 11 U.S.C. §§ 362(d) and 363(e)* (the "**Cash Collateral Motion**"), through which Gabriel sought to compel the Debtors to distribute to Gabriel the portion of the proceeds of Verizon Transaction I representing the Minimum Claim Amount pursuant to sections 362(d) and 363(e) of the Bankruptcy Code.

On March 16, 2005, the Bankruptcy Court conducted a pre-motion conference (the "**March 16th Conference**") with Gabriel, the Debtors and the FCC to discuss the scheduling the Cash Collateral Motion *vis-à-vis* the Debtors' pending Federal Bankruptcy Rule 9019 motion to approve a settlement with the FCC. During the March 16th Conference, the Debtors contended that Gabriel is precluded from being treated as a secured creditor and entitled to no postpetition interest because the FCC had taken the Debtors' licenses (and subsequently returned them) during the pendency of the chapter 11 cases. On March 22, 2005, the Debtors filed the *Opposition to the Motion of Gabriel Capital L.P. to Compel Payment Pursuant to 11 U.S.C. §§ 362(d) and 363(e) of the Bankruptcy Code* (the "**Cash Collateral Opposition**").

On March 23, 2005, Gabriel filed an objection to the Debtors' application for an order approving the FCC Settlement Agreement. The bases for Gabriel's objection included that the FCC Settlement Agreement purported to compel Gabriel to release any third-party claims against the FCC relating to the FCC's invalid attempt to cancel the Licenses, while the Debtors were simultaneously asserting that the FCC's actions with respect to the Licenses somehow destroyed Gabriel's security interest in the proceeds of the Licenses.

To resolve Gabriel's objection, the Debtors and Gabriel stipulated at a March 24, 2005 proceeding before the Bankruptcy Court that: (i) Gabriel's claims are not less than a stipulated prepetition claim amount and the Debtors do not object to allowance of Gabriel's claims in such amount; (ii) the Debtors will not assert that the Debtors or their estates may recover from any property that may be found to secure Gabriel's claim, or from any amount that may otherwise be payable to Gabriel, any costs, expenses, or charges pursuant to 11 U.S.C. § 506(c); (iii) Gabriel's claims are not subject to any counterclaims, defenses, offsets or subordination, except that the Debtors contest whether Gabriel's claims are secured claims entitled to post-petition interest and,

7

in the event they are found to be secured claims, the proper measure of interest; and (iv) the

Debtors would pay Gabriel the prepetition claim amount together with such interest that the

Court may determine Gabriel is entitled to from the License sale proceeds, subject to

disgorgement in the event the amount should be reduced on appeal). Additionally, the

Bankruptcy Court scheduled an expedited hearing on the issues of whether Gabriel's claims are

secured and, if so, whether Gabriel's post-petition interest accrues at the default rate provided by

the Financing Agreements. Gabriel and the Debtors subsequently submitted several briefs

addressing these issues, participated in a lengthy oral argument on April 7, 2005 (at which time

the Bankruptcy Court issued an oral bench decision that Gabriel's claim is oversecured), and

several brief additional colloquies over the next two and a half years. On December 11, 2007,

the Bankruptcy Court issued the Bankruptcy Court Order.

## VI.

## ARGUMENT

### The Bankruptcy Court Did Not Have Discretion to Reduce the Rate of Interest on Gabriel's Secured Claims to a Rate Below that Which Renders UC-NC Solvent

Section 506(b) of the Bankruptcy Code provides in relevant part that:

> To the extent that an allowed secured claim is secured by property
> the value of which . . . is greater than the amount of such claim,
> there shall be allowed to the holder of such claim, interest on such
> claim, and any reasonable fees, costs, or charges provided for
> under the agreement under which such claim arose.

11 U.S.C. § 506(b). Interest becomes a part of the creditor's oversecured claim under section

506(b). *Rake v. Wade*, 508 U.S. 464, 471 (1993).

"The great majority of courts to have considered the issue since *Ron Pair* have concluded

that postpetition interest should be computed at the rate provided in the agreement, or other

applicable law, under which the claim arose—the so-called 'contract rate' of interest." COLLIER

8

ON BANKRUPTCY ¶ 506.04[2][b][i] (Lawrence P. King et al. eds., 15th ed. rev.) (emphasis

added).  There is a strong presumption in favor of enforcing the contractual rate.  *See In re Vest*

*Assoc.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998) (discussing the emergence of this

presumption); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994), *cert. denied sub nom*

*Invex Holdings, N.V. v. Equitable Life Ins. Co.*, 115 S.Ct. 360, 130 L. Ed. 2d 313 (1994) (there

has emerged "a presumption in favor of the contract rate subject to rebuttal based upon equitable

considerations").  Indeed, the Bankruptcy Court observed that "without any exception that it can

recall, this Court has always awarded post-petition interest at the contract rate to oversecured

creditors in any case where the secured creditor was fortunate enough to be oversecured," while

noting that such is a general rule, but not a requirement, under *Milham*.  Bankruptcy Court Order

at 32.

     The rationale for the general rule was summarized in *In re P.G. Realty Co.*, 220 B.R. 773

(Bankr. E.D.N.Y. 1998):

> [W]here that power [to modify rights created by state law or
> private agreement is] not explicit -- where it resides only in general
> language directing the Court to allow interest on an oversecured
> claim -- the Court should be loathe to exercise it in the absence of
> compelling evidence that recognition of a right created by state
> statute or private agreement would do violence to the principles
> which constitute the foundation of bankruptcy law.  Case law
> offers four examples of such situations: where there has been
> misconduct by the creditor, where application of the statutory
> interest rate would cause direct harm to the unsecured creditors,
> where the statutory interest rate is a penalty, or where its
> application would prevent the Debtor's fresh start.

*P.G. Realty*, 220 B.R. at 780.

     Here, there were no allegations of misconduct by Gabriel, which made the initial loan to

UC-NC and has been forced to wait *over ten years* since the initial maturity date to be repaid.

Also, UC-NC has liquidated its assets and will not be making a "fresh start," irrespective of what

interest rate is applied to Gabriel's Claims. Therefore, the only issue that should remain for analysis is harm to the unsecured creditors. In this Appeal, Gabriel is not arguing that it should receive more interest than the Bankruptcy Court awarded it at the expense of UC-NC's unsecured creditors (although such an argument could be supported). Rather, Gabriel urges that the Bankruptcy Court's decision to reduce Gabriel's contractual interest to an extent that not only pays all unsecured creditors in full, but also, in the name of fairness, allows UC-NC to retain some of the License sale proceeds for shareholders, is contrary to authority and erroneous.

Gabriel has not discovered any instance in which a court has found an equitable basis for reducing a lawful contractual interest rate prescribed by a contract where a debtor was able to pay all of its unsecured creditors. The comparatively small number of decisions in which courts have declined to apply the default rate involved insolvent estates, where payment of the claim of an oversecured creditor at a default rate would have resulted in other creditors receiving little or no recovery. *See, e.g.*, *In re DWS Invs.*, 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) (25% default rate of interest excessive where the estate was insolvent); *In re Consolidated Props. Ltd. P'ship*, 152 B.R. 452, 457-58 (Bankr. D. Md. 1993) (other creditors, secured and unsecured, were likely to receive little or no recovery if the oversecured creditor was allowed interest at the default rate); *In re Hollstrom*, 133 B.R. 535, 539-40 (Bankr. D. Colo. 1991) (default rate of 36% was inappropriate because the debtor was insolvent); *Fischer Enters. v. Geremia (In re Kalian)*, 178 B.R. 308, 315 & n.16 (Bankr. D.R.I. 1995) ("[w]hen the estate is insolvent, the debtor's prebankruptcy bargained-for escalated default interest can be enforced only at the expense of junior, usually unsecured, creditors" *but* "[t]o the extent that an estate is solvent, leading to a surplus distribution to the debtor, such concerns are abated") (citations omitted); *Cunningham v. Am. Automatic Sprinkler Inc. (In re Trinity Meadows Raceway, Inc.)*, 252 B.R. 660, 669 (Bankr.

10

N.D. Tex. 2000) (denying award of postpetition default interest because "other creditors will be harmed"); *In re Maywood Inc.*, 210 B.R. 91, 93 (Bankr. N. D. Tex. 1997) (declining to utilize default interest rate where it was "unclear whether the unsecured creditors in this case will receive any distribution whatsoever").

The Bankruptcy Court based its authority to reduce Gabriel's interest for the benefit of the UC-NC (and, since it is a liquidating debtor, its direct and ultimate shareholders) on *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 91 L. Ed. 162, 67 S. Ct. 237 (1946) ("**Vanston**"), a decision which was not cited by either of the parties and predates the enactment of 11 U.S.C. § 506(b). Specifically, the Bankruptcy Court's decision is premised in great part upon a statement in *Vanston* that "the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id.* at 165 (Bankruptcy Court Order at 34).

However, as subsequently analyzed by the Court of Appeals for the Second Circuit in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960) ("**Ruskin**"), *Vanston* does not support the proposition that an oversecured creditor can be denied contractual interest for the benefit of the debtor or its shareholders, but just the opposite: a balance of the equities makes it inequitable to reduce contractual interest where an estate is solvent.

In *Ruskin*, the contract between the parties provided for 2% additional interest following acceleration of the debt. The district court did not allow the additional 2% interest, relying upon the same language from *Vanston*, that the Bankruptcy Court here relied upon -- that which states "the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors

and the debtor." *Ruskin*, 269 F.2d at 831 (2d Cir. 1959). The Second Circuit reversed,

explaining :

> It seems to us, however, that when this language is read in context
> it does not support the decision of the district court [to award less
> than contractual interest]. It follows after a discussion of two
> differing situations,

> "To allow a secured creditor interest where his security was worth
> less than the value of his debt was thought to be inequitable to
> unsecured creditors . . . . But where an estate was ample to pay all
> creditors and to pay interest even after the petition was filed,
> equitable considerations were invoked to permit payment of this
> additional interest to the secured creditor rather than to the debtor"
> [quoting *Vanston*], 329 U.S. at page 164, 67 S.Ct. at page 240,

> and refers only to that discussion.

*Ruskin*, 269 F.2d at 831.

> The Second Circuit thus distinguished that

> In Vanston the debtor was insolvent, and in our case it appears the
> debtor is solvent. . . . **[W]e hold that the Supreme Court did
> not intend that the principle enunciated by it in Vanston, in a
> contest between creditors, should be applied to a contest
> between a debtor's creditor and its stockholders**.

Id. at 830 (emphasis added). Accordingly, the Second Circuit concluded that it would be "the

opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act"

absent any unjust delay in the proceedings caused by the creditor. *Id.* at 832 (emphasis added).

    *Ruskin* remains controlling law in the Second Circuit. *See Citibank, N.A. v. Nyland Ltd.*,

878 F.2d 620 (2d Cir. 1989) ("Absent the special circumstances present in *Vanston*[3], no

---

[3] The unique circumstance in *Vanston* was that the insolvent debtor's failure to pay interest when due, resulting in the secured creditor's claim for interest on interest, was mandated by an order of the court prohibiting it from paying interest. In *Vanston*, the District Court for the Eastern District of Kentucky had appointed an equity receiver for a corporation and suspended payment of its debts. Subsequently, interest became due on bonds, but the court directed the receiver not to pay. The bonds provided for the payment of interest on unpaid interest. The Supreme Court declined to give effect to this "interest on unpaid interest" provision, noting that the provision was directly triggered only by reason of the district court's order suspending payment of the corporation's debts, such that the District

decision of this Court or any New York court has impaired the vitality of *Ruskin*"); *In re 139-141 Owners Corp.*, 306 B.R. 763, 771-73 (Bankr. S.D.N.Y. 2004) ("Ruskin remains effective to date in the Second Circuit and is recognized by other circuits." (citing numerous authorities)).

Thus, the Bankruptcy Court erred in relying on *Vanston* as providing it with discretion to equitably reduce Gabriel's contractual interest rate for the benefit of the Debtor and its shareholders because such an interpretation of *Vanston* was explicitly rejected by the Second Circuit. The Bankruptcy Court had no authority to exercise such discretion.

*See, also, In re D.C. Sullivan & Co. Inc.*, 929 F.2d 1, 3-4 (1st Cir. 1991) (citing *Ruskin* for proposition that secured creditors are entitled to post-petition interest where the debtor is solvent); *In re Courtland Estates Corp.*, 144 B.R. 5, 9 (Bankr. D. Mass. 1992) (allowing interest on oversecured claims at contractual default rates because "[a]s the Debtor has paid all pre-petition unsecured creditors . . . the equities of the case do not compel a different result. . . . Use of [a different rate] would merely provide an undeserved windfall to the Debtor"); *In re Kelton*, 137 B.R. 18, 20 (Bankr. W.D. Tex. 1992) (noting that when the estate is fully solvent such that the only party competing for the dollar sought via the higher interest rate is the debtor itself, "equity dictates that the court enforce the bargain originally struck between the prepetition debtor and the secured creditor"); *In re Consolidated Operating Partners, L.P.*, 91 B.R. 113, 116-17 (Bankr. D. Colo. 1988) ("When the debtor is solvent, the equities dictate that additional interest be paid to the secured creditor rather than to the debtor . . .").

Cases awarding contractual default interest have been analogous factually to this Appeal. For example, in *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y.

---

Court's own action would have led to the enrichment of the bondholders over the subordinate creditors of the insolvent corporation. *Vanston*, 329 U.S. at 164. Here, (i) UC-NC had defaulted pre-petition and was unable to pay interest to Gabriel for economic and business reasons, and (ii) the issue is whether interest allowed to Gabriel can be reduced *beyond* the amount needed to pay subordinated creditors and render UC-NC solvent.

1998), a solvent debtor had defaulted prior to the petition date under a mortgage loan agreement that provided for a default rate of interest. The debtor proposed to pay the mortgagor's oversecured claim "in full" on the effective date of the plan with postpetition interest calculated at the non-default rate provided by the underlying loan agreement. Recognizing that there is a presumption in favor of awarding secured creditors interest at the rate specified in the contract, Judge Garrity held that the creditor was entitled to the default rate of interest on its claim inasmuch as the debtor was solvent and the allowed claims of unsecured creditors would be paid in full. *Id.* at 551.

Similarly, in *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002), the holder of a first mortgage on the debtor's principal asset, an apartment complex, filed a claim that included amounts for a yield maintenance premium and default interest. The underlying loan agreement provided for the payment of a yield maintenance premium in connection with any prepayment of the loan, either voluntary or involuntary, and also provided for default interest at 5% higher than the non-default rate. The debtor objected to the claim to the extent that it included those amounts. The court held that the yield maintenance premium was permissible as an enforceable liquidated damages clause pursuant to New York state law and stated "deference to the parties' contractual choices" should be given by the court "and the court's refusal to evaluate those choices in hindsight is appropriate in the context of § 506(b). . ." *Id.* at 133. The court also held that the creditor was entitled to interest at the default rate, in addition to the yield maintenance premium, based on the "presumption in favor of the contract default rate subject to equitable considerations." *Id.* at 134.

Recently, in determining whether section 506(b) permits allowance of a statutory 18%

post-default rate, Judge Sand held, consistent with the above authorities, that there is no

equitable reason *not* to award default interest where the debtor is solvent:

> Debtor also argues that this Court should reduce the interest rate in
> this case because of equitable principles underlying the bankruptcy
> code. However, neither of the equitable principles used by other
> courts to justify lowering the interest rate - namely whether the
> imposition of the statutory [18% default] rate would cause
> unsecured creditors to suffer direct harm or would impede the
> Debtor's "fresh start" - offer a compelling justification for a rate
> reduction here. After all outstanding property tax liens, including
> interest at the 18% rate, were paid, there was still enough money
> left from the sale of the property on which the taxes were due to
> satisfy all remaining claims and to provide Debtor with a
> $2,000,000 surplus. In this way, no unsecured creditors were
> harmed and debtor was left with adequate means for a "fresh start."
> Having determined that the 18% rate is not a *de facto* penalty and
> that there are no equitable considerations compelling a rate
> reduction, this Court affirms the Order of the bankruptcy court.

*In re Coney Island Amusement, Inc.*, 2006 WL 617979 (S.D.N.Y. March 13, 2006).

As noted by the Bankruptcy Court, the 18% interest rate in *Coney Island Amusement* was

materially lower than the *equivalent* simple interest rate at issue in this Appeal. *See* Bankruptcy

Court Order at 39, n.83. That, however, is purely a result of the ten years that Gabriel has been

awaiting repayment -- the initial rate provided in the loan agreement was only 15% and the

default was 19%. The Bankruptcy Court did not find that the rate of interest on the Gabriel Loan

constitutes a *de facto* penalty (Bankruptcy Court Order at 36), rendering the difference in the

rates between *Coney Island* and the instant Appeal a distinction without a difference.

In sum, Gabriel submits that there is no recognized legal basis for the Bankruptcy Court

to have concluded that it had discretion to reduce the interest awarded to Gabriel by a degree

greater than necessary to pay all of UC-NC's unsecured creditors in order to benefit UC-NC and

its shareholders.[4]   To the contrary, it appears that the Bankruptcy Court has ventured down the "precariously slippery slope" of substituting its judgment, however carefully reasoned, for that of the contracting parties.  Recently, in the process of awarding interest at a default rate of 36% (versus a non-default rate of 12%), the court in *Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.)*, 338 B.R. 450, 458 (Bankr. D. Colo. 2005) warned of this danger specifically in the context of 11 U.S.C. § 506(b).

After observing that Congress drafted section 506(b) without a "reasonableness" requirement (*id.* at 459), the court explained:

> Being guided by a judge's sense of what is fair under the circumstances, as opposed to the language of the Bankruptcy Code and the dictates of non-bankruptcy law, may be a precariously slippery slope.  If a bankruptcy court can decide, in particular circumstances, that an otherwise enforceable default interest rate is too high, what restrains it from also determining, without relying on Bankruptcy Code language or non-bankruptcy law, that the amount paid by a debtor on any credit sale of goods or services is inequitable in the circumstances, and thus unenforceable as a claim in bankruptcy?  In a claim of skeptical co-equal branches of government and a citizenry that is poorly informed about the import of judicial independence, substituting the court's equitable powers for the marketplace, as it is constrained by legislative dictate, is not without risks to stability of the judiciary that may accompany failure to restrain judicial discretion.  This nation's tradition of a "rule of law" embraces the notion of a populace that will accept the courts as ultimate arbiter in applying the law to resolve disputes.  In order to maintain this tradition, courts must nurture the public's confidence that courts will not, in the name of judges' vision of justice and equity, substitute judges' will for that

---

[4]  The Bankruptcy Court also cited to the "unique circumstances" of UC-NC having successfully maximized the value of their estate to an extent that permits creditors to be paid in full.  As a debtor in possession, UC-NC was legally obligated to do no less than make such efforts, and Gabriel has found no authority recognizing a successful chapter 11 process as a basis to reduce interest awarded to an oversecured creditor.  Also, as noted in note 2 above, the cost of the efforts were not "bankrolled by equity" but funded by one equity holder who was compensated by receiving 15% interest on the funds that he loaned and repaid in 2005 ahead of Gabriel's claim.  The record does not indicate that the other ultimate equity holders were anything other than spectators.  Irrespective, under *Ruskin*, the uniqueness circumstances is only a relevant consideration for balancing equities among creditors, not between secured creditors and a debtor or its shareholders.

of the people, as expressed in the statutes enacted by the people's
elected representatives.

*Id.* at 460.

The *Hepner* court concluded that "it is not the Court's charge with respect to [the secured

creditor's] interest rates to determine what is reasonable or equitable." The Court allowed the

creditor -- an investment fund that bought the claims after the loans were in default -- interest at

the rate of 36%, 2400 basis points above the non-default rate. While other courts, including in

this Circuit, have disagreed and held that a Bankruptcy Court does have limited discretion to

balance the equities among competing creditors of an insolvent debtor (but, under *Ruskin*, not

between creditors and shareholders), the Colorado Court's legitimate fears about harm to the

integrity of the judicial system provide an additional public policy basis for concluding the

Bankruptcy Court erred in readjusting Gabriel's contractual interest rate in order to transfer value

from Gabriel to the Debtor and its shareholders, who were after all the very entities that

negotiated and agreed to the contractual rate in the first place.

## CONCLUSION

Under *Milham* and other authorities decided within this Circuit, a Bankruptcy Court's

discretion to adjust the rate of interest awarded under 506(b) is only "limited discretion." The

Second Circuit's decision in *Ruskin* restricts the limits of such discretion to balancing equities

and recoveries between creditors, not between creditors and a debtor or its shareholders.

Furthermore, important public policy concerns mitigate against courts reducing in the name of

fairness or equity negotiated contractual rates of interest payable to a good faith, oversecured

creditor by a solvent debtor where such rates are not *de facto* punitive. Accordingly, Gabriel

urges this Court to reverse and remand the Bankruptcy Court Order with instructions to increase

the award of post-petition interest to Gabriel to the highest amount in excess of 25% that still

permits UC-NC to repay its unsecured creditors.

Dated:     February 27, 2008
        New York, New York

                                KASOWITZ, BENSON, TORRES
                                  &amp; FRIEDMAN LLP

                                /s/ Robert M. Novick
                                David M. Friedman (DF-4278)
                                Robert M. Novick (RN-4037)
                                1633 Broadway
                                New York, New York  10019
                                Tel:  (212) 506-1700
                                Fax:  (212) 506-1800

                                COUNSEL TO GABRIEL CAPITAL L.P.